### In re BOGENA & WILLIAMS.
### ALBRIGHT v. McDERMOTT.
#### No. 5348.

Circuit Court of Appeals, Seventh Circuit.
April 17, 1935.

Lyle Thomas and Glenn Ratcliff, both of Lewistown, Ill., for appellant.

Ira J. Covey, of Peoria, Ill., for appellee.

Before EVANS, SPARKS, and FITZ HENRY, Circuit Judges.

SPARKS, Circuit Judge.

This is an appeal from a decree allowing a preferred claim in favor of appellee against the receiver of the Canton National Bank of Canton, Illinois, hereafter referred to as the Bank, and directing payment of the claim.

On November 3, 1932, the trustee of the bankrupt, Bogena & Williams, doing business as the Leather Shop, deposited with the Bank the proceeds of the sale of certain personalty of the bankrupt estate in the sum of $1038. The deposit consisted of $638 in currency, and one check for $350 drawn on a Peoria bank, and other small checks aggregating about $50 drawn on other banks. A certificate of deposit not subject to check was issued to the trustee bearing 2% interest per annum if the deposit remained four months, and 3% if it remained six months. On February 1, 1933, the trustee made another deposit of cash in the sum of $137.01 and a like certificate of deposit was issued to him for that amount.

Before these deposits were made, H. B. Heald, vice-president of the Bank, stated in good faith to appellee that that bank was a designated United States depository, and that he, Heald, presumed that it had authority to receive deposits of bankruptcy funds. After February 1, 1933, Heald, however, ascertained that the Bank was not a United States depository for bankruptcy funds, although it was a designated depository for other United States deposits.

In November, 1932, the $400 in checks was deposited in the regular course of business by the Bank, either in the First National Bank of Peoria, or in the Continental and Commercial National Bank of Chicago.

On March 3, 1933, the Bank closed its doors pursuant to the proclamation of the Governor of Illinois, and it remained closed during the national bank moratorium, and it was not again permitted to open. Heald was thereupon appointed its conservator and acted in that capacity until Lawlor was appointed its receiver on December 13, 1933.

For ten days after the trustee had made his first deposit in the Bank it had a credit with the First National of Peoria and the Continental of Chicago in excess of $1,038, and at the time the Bank closed it had a credit balance with each of the Peoria and Chicago banks named in excess of $1,038. During the bank moratorium, however, its account with the Continental of Chicago was overdrawn due to the dishonoring of certain checks sent in on March 3. From November 3, 1932, to the date the Bank closed it had cash on hand in excess of $2,000, and Heald, the conservator, received from the Bank in cash a sum in excess of the trustee's deposits.

On November 25, 1933, the conservator, by order of the court, sold part of the Bank's assets, known as the "Class A Assets" to the National Bank of Canton, a new organization. The new bank agreed to pay one hundred per cent. of all preferred claims and sixty per cent. of the general claims. Before payment of each preferred claim it was agreed that the conservator should deliver to the new bank a corresponding amount of Class B assets, or available cash, at the option of the new bank. All assets were not transferred to the new bank, and at the time of trial the receiver of the old bank had in his possession cash in excess of $20,000. Appellee did not claim or prove any other funds in the possession of the new bank which might have been available for payment of his claim. It was stipulated that an examination of the court's records would have disclosed the names of the banks

designated as United States depositories for bankruptcy funds, and that the trustee made no examination of those records. Proper demands were made upon the conservator and the receiver. The receiver admitted the validity of the claim as a general claim, but denied its right to a preference.

Upon these facts the court held that a trust relation existed between the old bank and the trustee at the times the deposits were made; that since the Bank was not a designated depository for bankruptcy funds it had no right to receive the deposits, hence took them as a trustee ex maleficio; that the relation of debtor and creditor at no time existed between the parties; that the Bank's assets were augmented by the deposits; and that the funds had been traced into the hands of the conservator. It was decreed that appellee's claim was preferred against the old bank and the conservator, and the new bank was ordered to pay the amount of the claim with costs within five days of the entry of the decree. That time was later extended to thirty days.

■ We are first confronted with appellee's motion to dismiss the appeal on the ground that appellant has not joined the new bank either as appellant or appellee. In Hightower v. American National Bank (C. C. A.) 276 F. 371, it was held that the liability of a bank and its shareholders was several rather than joint, so that the latter could appeal from a decree establishing a claim against the bank and ordering the shareholders to pay it without joining the bank or having severance. The case was affirmed by the Supreme Court without discussion of this point. 263 U. S. 351, 44 S. Ct. 123, 68 L. Ed. 334. The liability there arose out of a statute imposing it upon all shareholders in a national bank, while here it arises out of a contract. The liability of the new bank, if any, was by virtue of its agreement with the conservator to pay preferred claims. This did not create a joint liability. Further, it appears that in fact, although the decree in the case at bar orders the new bank to pay the claim of appellee, the new bank really has no pecuniary interest in the controversy, in view of the fact that under the terms of the contract of reorganization it was entitled to receive from the conservator, before payment of any preferred claims, a corresponding amount of Class B assets or cash. The record discloses the statement of the new bank that it did not contest the validity of the decree, and this, we think, was sufficient to constitute a waiver of its right to appeal, and eliminated the necessity of an order of severance, even if the decree had been joint. Cf. Richards v. American Bank (C. C. A.) 234 F. 300. Appellant, however, has by motion asked permission of this court to allow the new bank to enter its appearance, and for an order of severance. To this motion the new bank appeared and consented to the jurisdiction of this court over its person, and to an order of severance, the same as if it had been entered in the trial court, to the entry of any decision, order or judgment necessary to the determination of any motion presented by either appellant or appellee, or to a final determination of this cause, the same as if it had been one of the parties to this appeal. This, we think, is not necessary, and appellee's motion to dismiss the appeal is denied.

■ We think a trust ex maleficio did not arise by reason of the old bank accepting the deposits when it was not a designated United States depository for bankruptcy funds. A trustee in bankruptcy is vested by operation of law with the title to all the bankrupt's property, except that which is exempt. 11 USCA § 110; Mueller v. Nugent, 184 U. S. 1, 22 S. Ct. 269, 46 L. Ed. 405. Ordinarily, when money is deposited in a designated depository bank by a trustee in bankruptcy, it is deposited as other money is, and becomes the property of the bank, leaving the bank a debtor for the amount. Gardner, Trustee, v. Chicago Title & Trust Company, 261 U. S. 453, 43 S. Ct. 424, 67 L. Ed. 741, 29 A. L. R. 622. In Hancock County v. Hancock National Bank (C. C. A.) 67 F.(2d) 421, a bank designated as a depository for state funds accepted deposits of county funds without giving sufficient bond, as required by the statute of Georgia. It was there held that the bank acquired title to the funds deposited, and was not a trustee ex maleficio. In Bridge v. First National Bank of Detroit (D. C.) 5 F. Supp. 442, the facts disclosed that deposits were made by receivers without an order expressly authorizing such receivers to make general deposits, and the deposits were made without any agreement creating a trust or special deposit. The court held that, although the banks had knowledge that the funds deposited were receivership funds, no trust arose, for the banks had no reason to suppose that the making of such deposits was unlawful, and there was no evidence of any negligence, misconduct or bad faith on the part of the banks. See, also, Leach v. Beazley, 201 Iowa, 337, 207 N. W. 374; Flet-

cher v. Sharpe, 108 Ind. 276, 9 N. E. 142; Appeal of Miller (Commonwealth v. City Trust Company), 218 Pa. 50, 66 A. 995.

Appellee, in support of a contrary doctrine, relies upon In re Potell (D. C.) 53 F.(2d) 877; In re Weiss (D. C.) 2 F. Supp. 767; In re Ocean City Title & Trust Company's Bond (D. C.) 6 F. Supp. 311; Allen v. United States (C. C. A.) 285 F. 678; Board of Commissioners v. Strawn (C. C. A.) 157 F. 49; In re Battani (D. C.) 6 F. Supp. 376; Adams v. Champion (C. C. A.) 70 F.(2d) 956. In the Potell Case a trustee had not yet been appointed, and that fact was somewhat stressed in the opinion. The Weiss Case was largely based upon the Potell Case, although the trustee had been appointed and had made the deposit. The court thought that made no difference, saying there might be a distinction for technical reasons, not then important, but there was no difference for present purposes. There was, however, the additional fact that the bank had unequivocally and falsely stated to the trustee at the time the deposit was made that it was a duly designated depository for bankruptcy funds, when in fact it was not. That, indeed, was sufficient to render the distinction for other reasons unimportant. In the Ocean City Case, the court held that a surety on a bond given to secure bankruptcy deposits was entitled to have the bond canceled, where the depository substituted for the depository originally named in the bond was not an official bankruptcy depository. It was further held that the trustees in bankruptcy, in a summary proceeding, could petition the bankruptcy court to direct the receiver of the substituted depository bank to return the deposits. There was no fraud or misrepresentation on the part of the bank, and the court based its ruling on the Potell and Weiss Cases. The Allen Case had to do with public funds of the United States, and the acts complained of were in direct violation of the Criminal Code, R. S. § 5497, 18 USCA § 182. The Strawn Case related to acts of a bank which were in direct violation of the Ohio statute preventing a general deposit of public funds. In the Battani Case the court refers to different decisions of the federal courts under various states of fact. It discusses the Hancock, Potell and Weiss Cases, supra, and refers to the Strawn Case, and generally to numerous other cases in which it was held that where deposits were made in violation of a prohibitory law they became funds in trust for the depository. The court then said that the deposits in question became

trust funds by operation of law (11 USCA § 75 (a) (3) in case the depository bond was invalid. That question, however, was not before the court, because it held that the bond was valid and that there was no trust. The case of Adams v. Champion relied upon by appellee was reversed by the Supreme Court in a decision rendered February 4, 1935, 55 S. Ct. 399, 79 L. Ed. ——.

Wherein the cases relied upon by appellee are inconsistent with the rule laid down in the Hancock Case we are not willing to follow them. We think there should be and is a difference, so far as the liability of the bank is concerned, between the cases where the bank by mandate of law is prevented from receiving deposits, and those where a trustee is merely required to make his deposits in a certain bank. It would seem in the latter case that equity would place the burden upon the trustee, rather than upon the creditors of the bank after it has gone into liquidation. We assume he has given a bond for the faithful performance of his duties, and so far as this record discloses, the creditors of the bankrupt will not suffer. If he had made good the deposit to his trust, he would hardly be in position to enforce contribution from the bank under the evidence before us, for he was negligent in not ascertaining the proper place to deposit his funds. This was easily available to him from the source of his appointment, and it would seem to be unfair to permit him now to rely upon the uncertain reply of the bank officer, that he "presumed" his bank was authorized to receive the deposits, in derogation of the rights of the general creditors of the bank.

It is said by appellee, however, that it is not necessary that the trust relation be called a trust ex maleficio, and that any kind of an implied trust is sufficient, citing Adams v. Champion, supra. That case, as stated before, was reversed on February 4, 1935.

Aside from the questions already discussed, we think the decree must be reversed for failure to trace into the receiver's hands the amounts deposited represented by foreign checks. It was stipulated that the checks received on deposit were deposited by the Bank in the regular course of business, either in the First National Bank of Peoria or in the Continental and Commercial Bank and Trust Company of Chicago. It was further stipulated that for at least ten days after the deposits were made, the Bank had a credit balance with the First National of Peoria and also the Continen-

tal of Chicago in excess of the amount of appellee's claim, and that at the time the Bank was closed, it had a credit balance with each of those banks in excess of the amount of appellee's claim. What the condition of those accounts was during the interim is not shown. It was disclosed, however, that during the bank moratorium the account with the Continental Bank was overdrawn on account of a failure to honor certain checks that were sent in on March 3, 1933. It may be conceded that these checks were credited to the Bank by the Peoria and Continental banks and held by them as a part of the assets or the general funds of the Bank. However, it is not sufficient merely to show that the deposits went into the general fund of the Bank. They must have been traced into the receiver's hands.

The evidence is uncontradicted that neither the conservator nor the receiver of the Bank ever received any part of the credit balance in the hands of the Continental, due the Bank at the time it closed its doors. It may be assumed, though it is not specifically disclosed, that the conservator and the receiver received the credit balance existing in the Peoria Bank at the time the Bank closed its doors, and it may be assumed, although not admitted, that the credit balance in the Continental was received by the conservator and/or the receiver, yet those assumptions lend no aid to appellee's contention, because the credit balances in those banks on the tenth day after the deposits might have been depleted and replenished many times before the Bank closed its doors on March 3, 1933. The burden was upon appellee to disclose the condition of these accounts during the interim. This he failed to do, and as against the general creditors we are not permitted to presume that the accounts remained the same from February 11, 1933, to March 3, 1933.

The tracing of the cash deposited is less free from doubt. That was received by the Bank and mingled with its other funds. True, it was not earmarked, but it was never returned to appellee and at no time after the deposits were made did that bank's cash balance run below the amount of appellee's claim. We are therefore unable to assign any valid reason why those facts, under the assumption that the cash was held in trust by the Bank, are not sufficient to constitute a tracing of the deposited cash into the hands of the receiver, under the rule that when trust funds are mingled with others, the cestui may assert an equitable lien upon the mingled mass to the extent of his contribution thereto, aided by the heretofore well recognized presumption that the Bank kept its faith and had not expended the trust fund. The only thing that gives us pause in this conclusion is the pronouncement in St. Louis & S. F. R. R. Co. v. Spiller, 274 U. S. 304, 47 S. Ct. 635, 637, 71 L. Ed. 1060. There appellant on the theory of a constructive trust sought to recover freight charges illegally exacted by the carrier. The court said: " * * * Even if the overcharges, when collected, were subject to a constructive trust in favor of the shipper, the contention that the money exacted by the old company in 1906, 1907, and 1908 can be traced into the hands of the receivers is unfounded. The money was not earmarked. It was mingled when collected with other money received from operation. And no special account was kept of it. The latest exaction occurred five years before the appointment of the receivers. The assertion that the money collected can be traced into the receiver's hands is confessedly without any support except the stipulated fact that, throughout the ten years which elapsed between the earliest exaction and the transfer of the properties to the new company, the old one and the receivers had, at all times, in the *several* banks on which checks for current expenses were drawn, a working balance, in the aggregate, largely in excess of Spiller's claim. Such a showing fails to bring the present case within the rule by which, when trust funds are mingled with others, the cestui may assert an equitable lien upon the mingled mass to the extent of his contribution thereto. * * * An illegal exaction does not impress an indelible trust upon all funds which the wrongdoer and his successors may thereafter have on deposit in their *banks.* For aught that appears, all the money illegally exacted may have been spent for current operating expenses." (Our italics.) It is appellant's contention that this ruling in effect does away with the presumption that has heretofore obtained that trust funds are to be considered unexpended to the extent of the lowest cash balance of the account since the time of the deposit. We are loath to accept that construction. The opinion does not specifically disclose wherein the facts stated fail to bring the case within the rule, but we are led to believe that it lay in the facts that there were several banks in which the company's working balance was kept, on which their checks for current expenses

were drawn, and there was no showing as to how much, if any, of the illegal exactions were deposited in each bank. Until this was done there was no basis upon which the presumption could operate. Appellee in that case had merely aggregated the total cash balances of all the banks and sought an equitable lien on the total amount. That was merely tracing the funds into the general assets and asking to impress an indelible trust upon all of them. This, as we interpret that opinion, can not be done. We find no indication in that case of an intention to strike down the presumption heretofore referred to when the proper basis is laid. In the instant case we think the proper basis was established with respect to the cash, providing it could be considered trust funds, but as to this contention we feel impelled under the recent decisions to rule adversely to appellee. We do not wish to be understood as saying that the recent decisions have abrogated former positive rules of law with respect to trust funds, but they have required stricter proof in the establishment of trust funds where general creditors are involved. This no doubt is in deference to the expressed intention of Congress especially with respect to national banks. R. S. § 5236, 12 USCA § 194.

The decree is reversed and the cause remanded for further proceedings not inconsistent with this opinion.